***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement dated 15 May 2000, as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. All parties are properly before the Commission, and the Commission has jurisdiction of the parties and the subject matter.
3. The employer/employee relationship existed between plaintiff and defendant-employer.
4. Defendant-employer regularly employs three or more employees.
5. Liberty Mutual is the carrier on the risk.
6. Documents stipulated into evidence include the following:
a. Stipulated Exhibit #1 — Plaintiff's Medical Records
b. Stipulated Exhibit #2 Industrial Commission Forms
c. Stipulated Exhibit #3 Discovery
 d. Stipulated Exhibit #4 Recorded Statement of plaintiff
e. Stipulated Exhibit #5 IC Form 22 (none submitted)
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 53 years old. He graduated from high school and spent four years in the Navy. Plaintiff has been employed as a warehouse storekeeper in the Navy, at a grocery store, making briefcases and cabinets, as department manager of a department store, putting up awnings and carports, as a warehouse manager for a furniture store, as a car upholsterer, a commercial plumber, servicing vending machines, at a warehouse for the Roses company, and at the Americal industrial site.
2. Plaintiff has had two prior workers' compensation claims. Plaintiff suffered a rotator cuff injury in 1992 and that claim has been settled. Plaintiff has not had problems with his arm since the settlement. Additionally, while working for Americal, plaintiff was filling orders when he pulled a bag out of a bin, injuring his back at L4-5. Dr. T. Craig Derian performed surgery in April 1997, consisting of a bilateral lumbar decompression at L4-5 and a unilateral decompression at L5-S1 left. Plaintiff recovered well after the surgery but was careful about certain movements and lifting heavy objects. This claim was settled as well.
3. Plaintiff became employed as a security guard by defendant-employer on 1 July 1998. He worked from 11pm until 7am and was paid $7.00 per hour for 40 hours per week. One and one-half weeks prior to his injury which is the subject of this claim, plaintiff received a raise to $7.35 per hour. In addition to preventing theft, plaintiff's job duties included closing and securing 75 doors and locks, securing the building for the night, checking for fire hazards and making sure the fire equipment was in working order. Additionally, he checked out employees leaving work, and sat in the office checking in truck drivers. From 5 a.m. to 6 a.m., he checked the gates and opened those that would be needed for the day. Those entering and leaving the premises did so through an electronically operated gate.
4. On 16 October 1999, near the end of his shift, plaintiff was trying to let the plant maintenance man in the gate when the electronic switch malfunctioned. Plaintiff went downstairs to assist in manually lifting the gate and was doing so when he felt an unusual pulling sensation in his low back. As plaintiff climbed the stairs back to his office, his back began to hurt even worse, and he felt pain in his right leg. Plaintiff completed his shift and notified his sergeant, Mike Mosely, of the injury when he came to relieve plaintiff at 7 a.m.
5. Plaintiff was next scheduled to work on 18 October 1999. He informed his employer that the injury had worsened over the weekend and that he could not report for work but needed to see a doctor. He was directed to go to Henderson Family Medicine. Plaintiff was seen by Dr. Willard E. Valentine who took x-rays, administered medication, and took plaintiff out of work until 8 November 1999. Plaintiff was then referred to Dr. Leonard Nelson at Raleigh Orthopedic Clinic.
6. Plaintiff presented to Dr. Nelson on 8 November 1999. Plaintiff's symptoms included severe pain in the front of his left thigh and back. Dr. Nelson noted objective symptoms such as muscle spasms and a positive straight leg raise. Dr. Nelson diagnosed a probable pinched nerve from a herniated disc, and opined that the injury was consistent with plaintiff's description of the gate lifting incident and that it was "very reasonable" that plaintiff could have injured his disc lifting the gate as described. He also agreed that a person who has a pre-existing degenerative low back problem can have an incident that pushes him over the edge from ability to disability. He stated that a person with a prior laminectomy is much more likely to have such an injury than the general population.
7. Dr. Nelson did not believe that plaintiff was malingering, so he prescribed medications and physical therapy. He ordered plaintiff out of work until at least 22 November 1999. When plaintiff returned to Dr. Nelson on 6 December 1999, he ordered an MRI. Dr. Nelson testified that he likely ordered plaintiff to stay out of work on 6 December 1999 as well.
8. On 6 December 1999, Liberty Mutual Group executed a Form 61 Denial of Workers' Compensation Claim; therefore, plaintiff was no longer able to receive medical care paid by defendants. Plaintiff then returned to his former surgeon, Dr. Derian, stipulated by the parties to be an expert in orthopedic surgery. Dr. Derian's previous surgery on plaintiff had been successful until the injury of 16 October 1999. On his first visit to Dr. Derian on 2 February 2000, plaintiff recited the same consistent history of injury and related that he suffered low back and right leg pain. Dr. Derian also ordered an MRI.
9. Plaintiff returned to Dr. Derian on 2 March 2000, reporting that his leg pain was worse than his back pain. Dr. Derian noted several positive objective findings in his exam. Dr. Derian disagreed with the radiologist's interpretation of the MRI in that Dr. Derian believed that the degenerative bulging was causing neural compression, right greater than left. Dr. Derian agreed with Dr. Nelson that plaintiff was not exaggerating his symptoms or acting in any other inappropriate manner. Dr. Derian diagnosed lateral recess foraminal stenosis related to degenerative bulging, facet degeneration and dynamic changes at L4-5 and L5-S1 primarily on the right side. Dr. Derian described how trauma, such as the gate-lifting incident, can cause a previously asymptomatic degenerative condition to become symptomatic and disabling. Dr. Derian opined that the gate lifting incident had caused plaintiff's low back and leg symptoms. According to Dr. Derian, plaintiff will "very likely" need low back surgery in the future as a result of the injury at issue. He also noted that plaintiff continued to be disabled from work.
10. On 20 March 2000, Dr. Derian ordered a lumbar epidural steroid injection. The injection was performed by Dr. Bacon at Durham Regional Hospital. Following the injection, plaintiff's symptoms improved for about a day and a half and then returned.
11. Because Dr. Derian's office does not accept Medicaid, plaintiff's last appointment with Dr. Derian was 17 April 2000. Dr. Derian's final diagnosis was symptomatic lumbar degenerative disc disease at L4-5 and L5-S1 and structural disc degeneration at L1-2 and L2-3. Dr. Derian remained of the opinion that plaintiff would likely not be able to return to work until he received appropriate treatment for the back injury. He further noted that plaintiff may not even be able to return to a sedentary job if his back pain does not improve.
12. On 30 June 2000, plaintiff had been out walking for exercise. Plaintiff walked up onto the porch of his home when his right leg gave way causing him to fall and fracture his right fourth and fifth metacarpals of his right hand. He went to the Emergency Room at Maria Parham Hospital on 1 July 2000, where x-rays revealed the aforementioned fractures.
13. On 3 July 2000, plaintiff went to Triangle Orthopedic Associates on referral from the Emergency Room. The right fifth metacarpal fracture was described as "comminuted". Plaintiff's right wrist fracture was treated primarily with splints until 21 August 2000 when plaintiff was referred to therapy at Maria Parham Occupational Therapy.
14. Plaintiff's symptoms became suggestive of reflex sympathetic dystrophy, or complex regional pain syndrome (CRPS), so plaintiff was referred to Dr. Robert J. Wilson, III, a physical medicine and rehabilitation specialist at Triangle Orthopedics who also is board certified in pain medicine. Dr. Wilson agreed with Dr. Derian that plaintiff's leg could have given way in the manner described and caused him to fall and fracture his wrist. Dr. Wilson, by objective findings in his physical examination combined with objective findings following a stellate ganglion block, confirmed a diagnosis of CRPS. It is Dr. Wilson's opinion that the CRPS was a result of the wrist fracture, and that the wrist fracture was a result of the back condition causing the leg to give way. Dr. Wilson believed, and the Full Commission finds, that plaintiff's story about how he fell and injured himself is credible. Dr. Wilson also found no signs of symptom magnification in his examination.
15. On 18 October 2000, Dr. Wilson performed electrodiagnostic testing to plaintiff's right upper extremity and found significant carpal tunnel syndrome. As the carpal tunnel syndrome was severe, plaintiff was referred back to an orthopedic surgeon for a surgical evaluation. Dr. Wilson found that the carpal tunnel syndrome was also a result of the wrist fracture.
16. Dr. Wilson stated to a reasonable degree of medical certainty that, given the combination of back symptoms and hand symptoms, it would be "very unlikely" that plaintiff could be gainfully employed at this time.
17. As a result of injuries sustained on 16 October 1999 while at work for defendant-employer, plaintiff has been unable to earn wages in any capacity from 18 October 1999, the first day after his injury that he was scheduled to report to work, until the present and continuing.
18. On 16 October 1999, plaintiff suffered an injury by accident to his low back, arising out of and in the course of his employment with defendant-employer which is the direct result of a specific traumatic incident of the work assigned. Said injury by accident aggravated a non-disabling pre-existing condition to the point that it thereafter became totally disabling and required further medical care.
19. Plaintiff earned $7.00 per hour for 50 weeks of the year prior to the date of his injury. Approximately two weeks prior to his injury, plaintiff received a raise to $7.35 per hour. Computing plaintiff's wages for the 52 weeks prior to the date of his injury based upon a 40 hour work week and using the above amounts, plaintiff earned a total of $14,588.00. Dividing that amount by 52 weeks results in an average weekly wage of $280.54, yielding a compensation rate of $187.04. This method of computing plaintiff's average weekly wage most nearly approximates the amount which plaintiff would be earning were it not for his injury, and there are no exceptional reasons in this case which, in fairness to the parties, mandate computing plaintiff's average weekly wage in a manner other than the above method as set out in N.C. Gen. Stat. § 97-2(5).
20. As Dr. Craig Derian is stipulated to be an expert in orthopedic surgery, has developed a doctor-patient relationship with plaintiff, and has previously performed successful surgery on plaintiff's low back, he is the most appropriate physician to continue care of plaintiff's low back condition.
21. Since plaintiff's primary back injury is compensable, plaintiff's subsequent right leg give-way, fall and wrist fracture, and the resulting complex regional pain syndrome and carpal tunnel syndrome are all natural consequences that flow from the original injury. The fall and the aforementioned resulting conditions are all direct and natural results of the compensable primary back injury and are not the result of an independent intervening cause attributable to plaintiff's own intentional conduct.
22. As plaintiff has already established an ongoing doctor-patient relationship with Dr. Liebelt of Triangle Orthopedic Associates, who is board certified in orthopedic surgery and with Dr. Wilson, who is board certified in pain medicine and physical medicine and rehabilitation, they are the most appropriate physicians to continue care of plaintiff's right upper extremity injury and resulting chronic pain condition.
23. Plaintiff has not reached maximum medical improvement from his injuries.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On 16 October 1999, plaintiff sustained an injury by accident to his low back, arising out of and in the course of his employment with defendant-employer and is the direct result of a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(6).
2. The compensable low back injury caused plaintiff's leg to give way on 30 June 1999 resulting in a fall from his porch that caused the fractures to his right wrist that then resulted in the complex regional pain syndrome and carpal tunnel syndrome in his right upper extremity. The fall, wrist fractures, complex regional pain syndrome and carpal tunnel syndrome in his right upper extremity are all natural consequences that flowed from the original injury. The fall and the aforementioned resulting conditions are all direct and natural results of the compensable primary back injury and are not the result of an independent intervening cause attributable to plaintiff's own intentional conduct. N.C. Gen. Stat. § 97-2.
3. Plaintiff earned $7.00 per hour for 50 weeks of the year prior to the date of his injury. Approximately two weeks prior to his injury, plaintiff received a raise to $7.35 per hour. Computing plaintiff's wages for the 52 weeks prior to the date of his injury based upon a 40 hour work week and using the above amounts, plaintiff earned a total of $14,588.00. Dividing that amount by 52 weeks results in an average weekly wage of $280.54, yielding a compensation rate of $187.04. This method of computing plaintiff's average weekly wage most nearly approximates the amount which plaintiff would be earning were it not for his injury, and there are no exceptional reasons in this case which, in fairness to the parties, mandate computing plaintiff's average weekly wage in a manner other than the above method as set out in N.C. Gen. Stat. § 97-2(5). Hendricks v. Hill Realty Group, Inc.,131 N.C. App. 859, 509 S.E.2d 801 (1998).
4. As a result of his compensable injury by accident on 16 October 1999, plaintiff has been unable to earn any wages in any capacity since 18 October 1999 and is therefore entitled to temporary total disability compensation at the rate of $187.04 per week from 18 October 1999 to the date of the hearing and continuing until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
5. To the extent the same are reasonably required to affect a cure, provide relief and/or lessen the period of disability associated therewith, defendants are required to pay all reasonable medical expenses incurred or to be incurred by plaintiff as a result of his compensable injuries by accident on 16 October 1999 and 30 June 2000. Drs. Derian, Wilson and Liebelt are hereby approved by the Industrial Commission as treating physicians authorized to attend, prescribe and assume the care and charge of plaintiff's medical conditions associated with this claim. N.C. Gen. Stat. § 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees awarded herein, defendants shall pay to plaintiff temporary total disability compensation at the rate of $187.04 per week beginning 18 October 1999 and continuing until further Order of the Industrial Commission. Any sums that have accrued shall be paid in one lump sum.
2. To the extent that defendants have paid any compensation in this case, they are entitled to a credit for those amounts paid. N.C. Gen. Stat. § 97-42.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his compensable injuries by accidents of 16 October 1999 and 30 June 2000. Drs. Derian, Liebelt and Wilson are authorized as plaintiff's treating physicians, and defendants shall pay for any reasonable treatment and/or testing prescribed by these doctors when bills for the same are submitted in accordance with proper Industrial Commission procedure.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff is hereby approved for plaintiff's counsel and shall be paid as follows: 25% of the accrued compensation due plaintiff shall be deducted and paid directly to plaintiff's counsel in one lump sum. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs.
This the ___ day of December, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER